All right, the next case is United States v. Goethe, and Mr. Carpenter, I guess you begin. Thank you, your honor. Good morning. May it please the court. I'm Robert C. Carpenter here on behalf of Donald Dodt, a 78-year-old businessman who's running a telephone business in Costa Rica called Callmaster. He was convicted and sentenced to nine months in jail for providing phone services that were used to use to perpetuate a sweepstakes scheme by a man named Rosenberg. I'm here to ask that you vacate the convictions and the sentence here. And instead of asking, I do recognize the high burden that I have, the heavy burden that I have for the conviction to be overturned. The case law is very clear that the government will, the court will see the evidence of the government here. But this is one of those rare cases where the court, where there is not substantial evidence to support the verdict in at least three different ways. First, there was a gap in evidence that was connected, that connected the victims of this conspiracy to the Rosenberg conspiracy. Number two, there's a lack of substantial evidence that the victims are over the age of 55. And three, there's the, there's lack of substantial evidence that Mr. Dott had the criminal intent to engage a conspiracy in aiding and abetting for those charges. And there's also some sentencing issues to cover today. And so there's a lot of issues. Let me ask you, as a preliminary question, is there any, are you taking any exception of, to the notion that while Mr. Dott didn't engage in the actual discussions of fraud with the victims and didn't design that whole program, didn't select the method of doing it, he did support the operation with a very highly necessary phone service, changing phone numbers, phone locations. And he was aware apparently that they were moving from place to place. He heard conversations, he commented on them, and he even reported about FBI information. So that as a general matter, whatever is imputable to Rosenberg, as a general matter, would be imputable to him as a, as a participant, a person who's substantially aided the operation. Please, I'll agree with that, your honor. Not maybe all the facts you've cited, but certainly if he was convicted of conspiracy and aiding and abetting and the elements were meant for that, he could be liable, as the government says, for the substantive charges. I don't believe that's in dispute today. I do want to start with talking about the Rosenberg scheme and how it's not really different than all these other schemes that are happening in Costa Rica. There's lots of evidence that these types of sweepstakes schemes were very common in Costa Rica. If you look at Quattle Bomb, the lead agent at State Joint Appendix 942, there's a lot of telemarketing fraud in Costa Rica. And I list a number of sites from the record on page 14 of my brief where everybody else agrees. In fact, you have co-conspirators here who branched off and started their own sweepstakes fraud using the same scheme that Rosenberg had. And of course, it gave you tons of other case sites, both in District Court and other District Courts with the same scheme. So, but there's a gap in evidence here connecting these victims to the Rosenberg scheme. Certainly, there are victims of a scheme, but certainly Rosenberg's and his co-conspirators weren't engaging in this type of fraud. There's a lack of evidence here on that. And that's admitted by the government's lead agent, Anton Quattle Bomb. He didn't know whether all the victims had money, for example. He admitted that on page 962. He didn't bother to contact the victims. He said that on also 962, 959, and 960. He also admitted that the conspiracy or the money could have been sent outside the conspiracy. That's joined appendix 960 and 961. He didn't even confirm that the receiver of the money actually received it. And even if he did, there's no evidence he did so as part of the Rosenberg scheme. So, there's a lack of evidence connecting this scheme, the Rosenberg scheme, to these victims. Additionally, there's no evidence to show that there's the call master numbers that were given were used to call these particular victims. What are the numbers that were used to contact these victims? Well, we don't know. We don't know what numbers Dot provided to Rosenberg and his co-conspirators. That's not on the record. So, there's a lack of evidence also connecting Dot and the numbers he provided to the co-conspirators, excuse me, to the victims. He was also convicted of a charge where if he, there's an enhancement. When you say there's a lack of evidence, do you mean lack of direct evidence rather than circumstantial evidence? No, I mean, when I say lack of evidence, I mean lack of substantial evidence for that standard in this court. There's not enough to connect Rosenberg to these particular victims. And Judge Cogburn acknowledged that there was, the evidence wasn't kind of thin on some cases, in some parts of the case, didn't he? Well, I don't, I don't remember if that's on the record. You're entitled to the inferences and things like that, too. Yeah, they are. And again, you know, the court has limited scope of review. There's, it's a tough standard for me to meet here. But there does need to be some evidence for the jury to pass a verdict on. And I don't recall Judge Cogburn saying that at a trial. I did cite many examples that Judge Cogburn said, classifying these voice services as fraud when in fact they're not. That's what stuck out to me with Judge Cogburn. But with respect to the... Mr. Carpenter, let me ask you this. With respect to the first issue you raised, which I agree with you is a kind of a critical link, that these victims sent money to the Rosenberg sweepstakes versus another sweepstakes in Costa Rica. You make a specific objection about the so that objection and you have to unpack it. But essentially, there's, as I count, there's 17 wire fraud counts across 15 victims. And as I understand your argument, only five of those victims testified at trial. Three of those, Ms. Vadgama, Ms. Fisher, and Ms. Dittman, through their testimony, couldn't necessarily link the money they sent to Rosenberg through a common runner like Mr. Gutierrez or otherwise. And then you have eight other victims who didn't testify. And as far as I can tell, there's no other evidence but for this summary exhibit 28, where you have kind of the victim and sender information and the corresponding Quattle Bomb exhibit. So your argument is those were improperly admitted as hearsay exhibits. Government says they weren't offered for their truth. My question for you, if that's the only evidence as to those wire fraud counts for those victims and they weren't offered for their truth, where are we? Well, first of all, do you think they were offered for the truth? I mean, they say it's background. It's why the agent did what he did. I very much disagree with that point. These were offered for the truth. These were offered to show that these FTC complaints were of actual victims and that he's able to link those to the Rosenberg scheme through the testimony of Rosenberg, not testimony, excuse me, through the debriefing of Rosenberg. I guess my problem to the extent it may be a problem is why couldn't the government have asked Rosenberg directly when he was on the stand, show him exhibit 28. Do you recognize this victim? How do you know that was one of your victims? So the issue is that they backdoored it potentially, did it indirectly. The agent said, well, he told me that in a proffer or I went on the FTC database and I got a name. Therefore, this is a victim. I do think I agree with you. I think that was admitted for the truth of the matter of certain. There may be an issue with respect to some of these wire fraud counts for these victims who didn't testify and there's no other evidence linking that with conspiracy. And I would add that Rosenberg called these victims by purchasing lead sheets from people. These lead sheets are physical documentation with these victims' names on it. They could have, as he alluded to, put Rosenberg on the stand and had him testify to those lead sheets and say these were victims. But again, there's no evidence of that. They didn't do that. And that's particularly true with his age of 55 count. They had to prove that there's 10 or more victims over the age of 55 in order for that count to happen. They don't have the ages of more than 10 at all. They didn't even bother to contact the victims. And so I think that count is an easy one for the board to throw out for that reason. There's no potential evidence of these people's ages. But isn't there that summary exhibit? And again, this gets into Quattle Bomb where there's certainly more than 10 where the occupation is listed as retired. And you had Rosenberg testify that most of them were elderly and I believe other co-conspirators did as well. I mean, you had five actually testify at trial. All that together, I think, permits the jury to conclude that you had 10 or more, doesn't it? I disagree. I mean, this is a matter of statutory interpretation. And the statute is very clear that it has to be over the age of 55. Yeah, but if somebody says I was dealing with somebody who was retired and together and has a list that is much longer, has numerous people in that category, isn't that sufficient circumstantial evidence? I would argue in response to that, that who are they? Who are the 10 victims who were over the age of 55? Who are the 10 victims who were elderly? Who are the 10 victims who are retirees? Yeah, but if you have a list of 50 or 60 or 100 or whatever the number is, and they all list as retired and Rosenberg says these were elderly people. Sure, you can question whether somebody at age 55 thinks himself as elderly. But I would that circumstantially you would get at least 10 out of that list. Your argument, I suppose, is we didn't pick the particular 10, maybe. Well, I would argue elderly is a fairly subjective term. It is. I'm combining it with retirement too, because retirement occurs sometimes at 55. But I think traditionally, it's usually older 60, 62, 65. And that's sort of a common sense approach. And it may not be sufficient, but I hear what you're saying. Yeah, I think you understand that argument. The third sort of lack of substantial evidence argument concerns the specific intent issue with respect to DOT. And the government acknowledges he didn't have crimes that they get there through a conspiracy, aiding and abetting, or worth of blindness. And now what are you here that respect to conspiracy, there's no agreement to commit a criminal act. All Mr. DOT did was agree to provide the same services at the same rate to Mr. Rosenberg and his cooperators to testify. He just provided us- Let me just change the facts just a little bit. Let's say this is a mafioso that everybody knows is a mafioso and is doing illegal work. And he's a subcontractor providing a central phone service for the operations of the mafia. And he chuckles with them. He knows what they're about. He basically says to himself, I'm not involved, I'm not doing the mafia stuff. But I recognize I'm helping them in a critical aspect. Is that enough intent? Well, it's not. I don't believe it's enough to rise to the- I think what you're alluding to is willful blindness. And that's what the jury, the only question the jury had was with respect to that instruction. So it's clear they consider this willful blindness instruction. And that willful blindness- Not only willful blindness, he actually knows, he didn't turn his head. He did his job, but he knows he's aiding and abetting illegal conduct. Not only aiding and abetting, but in a very essential sense. The whole operation needed the reformulation of telephone numbers, the movement of numbers, the telephones, the installations, the breaking down of them and putting them back up. And if he knows that operation is illegal and he's helping it. I think he personally, I read the record and I read his allocution and I read a lot about him because I think this is a very tough case in terms of a personal situation. This man lived a life as clean as a whistle. And here he thought he was isolating himself from the illegal conduct by not actually doing it, even though he knew he was helping it. That's a sort of a street assumption. I'm not involved. But as a matter of law, I would think if he knows exactly what they're doing, he knows he's aiding them. He knows his work is important to them. Don't we have a legal problem of excluding them from the conspiracy? What does he know? He knows that there's... So that's a factual question. I'm assuming, I get in my hypothetical, I'm assuming he knows it's mafia. He knows that mafia... And so then we transfer to this case and we get back to my Yes. Specifically, he wasn't aware that mail fraud, wire fraud, money laundering, those specific things were going on. Certainly, I think it's fair and what was able to approach to the government that he had knowledge of some kind of shady dealings. I think there's an example where he averts somebody from first standing a federal judge. That is a crime under federal law. So there's knowledge of that crimes commission, but there's not knowledge of these specific crimes what she was convicted of. And I know I'm out of time. I do want to talk about the sentencing issues, but I can do that on rebuttal or a different... I can do it now, whatever the court like. Yeah. Why don't we... You can pick that up on rebuttal. And I think at least with respect to one, I think the one involved in the defendant representing himself as a government agent seems to be a pretty clear challenge. But why don't we hear from the government and we'll get back to you. Mr. Cain. Good morning, Your Honor. May it please the court. Daniel Cain from the United States. I'd like to cover each of the issues addressed in my colleague's argument, including addressing the court's concerns about connecting the substantive counts. And I think the concern, Judge Neumeier, you just alluded to with 2B1B9A. But I think it's important to begin with a quick recap of the evidence, establishing Mr. Dodd's understanding that this was an unlawful scheme. That's Mr. Carpenter's third point. The question is, what did he know? And I think it's important to drill down a little bit on what did he know to make sure this court understands that Mr. Dodd was properly convicted of these conspiracy counts. So right from the beginning, when Rosenberg hired Dodd, he told him... Mr. Cain, did you try the case? I did not, Your Honor. Okay. Go ahead. Right from the beginning, when Rosenberg hired Dodd, he told him that he needed phone lines with D.C. area codes because his employees in Costa Rica would be calling from the U.S. government. And he added that he would need to change the phone lines and move offices when things got, quote, hot. Dodd then visited the call centers at least eight or nine times by his own testimony, more by other witnesses' testimony. And he overheard the pitches that the callers gave, including, notably, David Fairchild's, in which he pretended to be a federal judge, prompting Mr. Dodd to joke, you're looking mighty fine, Your Honor. Rosenberg also testified that any of the phone lines and, importantly, Dodd knew all the characteristics of the business, that he was paid in cash, he had no contract, that Rosenberg used an alias in his communications, that the call centers moved every few months, that they constantly changed phone numbers, that they were located in houses, not offices, that if you fast forward to after the arrest in this case, Mr. Dodd asked Fairchild not to mention him in interviews with law enforcement. And all of that, by the way, is apart from the evidence of the associated call centers, which includes evidence that Christian Serp, during the lifespan of the conspiracy, told Mr. Dodd, when they're doing an analogous scheme, quote, what we're doing is a little shady, and that Mr. Dodd told Laitano to, quote, stay away from the Rosenberg call centers. So all of that, I think, overwhelmingly establishes Mr. Dodd's knowing participation in the conspiracy. And because he joined the conspiracy with the intent to further it, he was responsible for the reasonably foreseeable substantive offenses committed in furtherance of the conspiracy. I just want to make sure the court is totally clear about the evidence supporting the conspiracy. And unless the court has any questions on that, I can turn to some of the substantive counts that Judge Cullen, in particular, was discussing with Mr. Carpenter. Just to shorten up, because there are a lot of counts. My concern is similar to Judge Cullen's, and I'm focusing on counts 9, 10, 11, 14, 16, 23, 25, and 31. Those are the eight counts where nobody testified, and it relied exclusively on this testimony of Quattlebaum. And not only that, your brief gives it about two sentences of support. I'm sorry about that, Your Honor. Yeah, let me try that. No, no, you don't need to apologize. There may not be much there. Well, let me try to walk you through it. And then, Mr. Cain, before, this will probably be helpful so you can address it all at the same time. That gamma, Ms. Fisher, you had two Ms. C.H. and then Ms. Dittman. They did testify at trial. My problem with them is it's very vague. 202 Area Codes, Mike called me and I sent money to Costa Rica. That doesn't mean it went to the Rosenberg conspiracy. And then you have the ones Judge Niemeyer identified. I can't find any other evidence linking those wire transfers other than these exhibits. So let me ask you this question. Are you arguing that Exhibit 28 was not offered for the truth of the matter asserted? Uh, yes, Your Honor. Let me just make, uh, one point. Just Ms. Dittman did testify that she sent money to, uh, Mr. Farrad Gutierrez. Um, to answer your question, yes. All right. So in that, if that's the case, her count in my mind is not problematic because Rosenberg testified about his role. Okay. Thank you. That's right, Your Honor. Um, yes, Your Honor. I think we are arguing and I think I can take this holistically to adjust, uh, Judge Niemeyer's question and your question as well, Judge Collins. Um, let's begin with the testimony that, that Judge Quattle, that, uh, Judge Quattle testified. He testified that the investigation all started with Rosenberg. Uh, Rosenberg identified some victims and schemers, some phone numbers, and some hallmarks of the scheme. For example, uh, the use of the DCRA, the Department of Consumer and Regulatory Affairs. The case agents then searched an FTC database for those names, those numbers, those hallmarks of the scheme, and then check those results with Rosenberg and the other co-defendants, corroborated that evidence with Rosenberg and the other co-defendants, used those names that they discovered, either through what the names that Rosenberg had provided or the FTC lists to query the Western Union, MoneyGram, and USPS databases. So what they're doing is, and those are, of course, admissible business records, and those, those exhibits are, you know. Yeah, but what about Rosenberg's testimony to the Quattle bomb, out-of-court testimony, identifying those? So those statements, Your Honor, were never admitted. The government never offered. No, they're not admitted, but they may be necessary. Well, I think they were logically necessary to the investigation, but I don't think that those statements were admitted for the truth of the matter asserted. It's hearsay, isn't it? Well, I don't think so, because, Your Honor, I don't... Quattle bomb's testimony, if Quattle bomb's testimony identifying that list to Quattle bomb, I mean, Rosenberg's testimony, uh, uh, pointing out to Quattle bomb which are involved, and then Quattle bomb makes a list from that, uh, and says this is what Quattle bomb, he essentially is saying this is what Quattle bomb told me. Right, Your Honor, I think... How does that support a conviction? I think it's, it, I think it supports the conviction, not because it was entered for the truth, but because it was correlated with... That's even worse. If it's not entered for the truth, there's no substantive evidence at all. No, Your Honor, I think it was. I think it's, the substantive evidence is that the names that Rosenberg identified, or the names that Quattle bomb and the other case agents were able to identify from Rosenberg's information, appeared on the admissible business records. It's that overlap. So, the fact that the government agents introduced admissible business records, and then queried those databases, those admissible business records for the information... It's the connection. The connection gives it probative value. It, it, it, it, that's not there, right? It's got no other purpose. And my problem is, if Rosenberg, if they could go into the jail and ask him, is this your victim, is this your victim, and is this your victim? They should have done that when he testified. That's the cleaner way to do this. And for whatever reason, they just said, oh, we met with him and he provided these links. I, I, I just, I'm having a real hard time with the argument. This wasn't offered for the truth of the matter asserted. I, I, I'm not buying that. Well, Your Honor, I don't think that... Well, even if it was, then there's no evidence. No, Your Honor, I don't think so. I don't think that's the only basis, because, Agent Quattle Bomb also testified that he spoke with, Rosenberg and co-defendants after, I'm sorry, that he, that the case agent spoke with many of the victims, attempted to interview all of the indictment victims, and interviewed many of the victims to corroborate the information, to validate the querying of the MoneyGram, the USPS, the Western Union business records. And so, Your Honor, I do think there are connections other than the bare fact of Rosenberg having identified... You, you, you in your brief, identified just what you're saying, that he created this list, but all he got to was a list of wire transfers with recipients who picked up money in Costa Rica. And then you say this in your brief, Quattle Bomb then reversed the search, running that list of recipients coupled with the potential recipients listed in the initial list through the same database, which yielded a longer list of wire transfers. He basically relied on his information with respect to other data, other call centers, and said, I'm familiar with them, and excluded them, and then assumed that the remainder belonged to Doat. Well, that's right, Your Honor, he excluded based on his own experience, and that is another reason... Yeah, but that does... That's not the only... But he didn't, but that, and then he didn't just assume that the remainder of... Let's assume he knows all the call operators. He knows all the names. I mean, we're talking about thousands of names from these various call operators. That's right, Your Honor, this is... And the only link to Rosenberg is Rosenberg's own identity of him to him. Otherwise, it's corroborated because the money did go to Costa Rica and the Western Union and so forth, but we still have the failed link of courtroom evidence that Rosenberg gave to Quattle Bomb. And that troubles me a little bit on those eight. Agent Quattle Bomb also testified that the case agents interviewed or attempted to interview all of the indictment count victims, and that it validate... That interview process validated the methodology. So it's not just... Did that hearsay too? No, no, Your Honor, I don't think so. You mean you go to the victim and the victim says basically, yes, I spoke with Rosenberg, and the case agent comes in and said, okay, we have this case. The victim told me, and I hear an objection, I say, sustain. Right, Your Honor. Your Honor also mentioned that Agent Quattle Bomb testified that he, from his knowledge, excluded... His knowledge of other call centers. That's right, Your Honor. Which assumes that he had universal knowledge. No, it doesn't assume universal knowledge. Remember, Your Honor, we're on the sufficiency review here and... Well, it's beyond a reasonable doubt. Well, that's right, Your Honor, but the jury made that judgment that these substantive counts were connected to the scheme beyond a reasonable doubt. And on sufficiency review, this court isn't inquiring into whether that jury... Well, if the jury is sitting there hearing a witness say, Rosenberg told me A, B, and C were appropriately on the list, and I confirmed it by looking at Westinghouse, and I interviewed it, and the person said it was... He was one of the payors to Rosenberg. Is any of that good? The jury heard it. The jury heard it and probably came to a verdict based on what they heard. But the question is, is that good evidence to support the conviction? Well, Your Honor, we think it is. We think it wasn't premised on hearsay. We think the fact that Quattle Bomb and the other case agents were able to eliminate some of the counts based on their prior knowledge is itself admissible evidence that would support the jury's verdict and is substantial evidence. But I take the court's concern, and I understand the court's concern. And I think it's important to remember that the conspiracy counts here and the substantive counts that were directly connected to the testimony survived that. And if I can, I'd like to address... Are you inclined to confess error on any of these counts? No, Your Honor, we're not. I understand the court's concern. Look, these cases are a bit difficult. You understand the concern, and you say the conspiracy counts clean and some other counts are clean. That's right, Your Honor. Why do you need those posts? Your Honor, candidly, I think Judge Cogburn in the district court, just speaking candidly, I think Judge Cogburn likely essentially said in the district court that he would have imposed the same sentence absent some of these substantive counts. So I understand the point. I would like, if I can, to address the remaining concerns that my co-counsel has identified. I'm sorry, my colleague on the other side has identified, including the over 55 enhancement. I think Judge Niemeyer's colloquy with my colleague, I think, got to the heart of that issue. I expressed some difficulty with understanding why the enhancement under B9A should be imposed, because that enhancement requires the defendant to be the person misrepresenting himself as a or a part of the government. And in this case, there's no evidence that the defendant misrepresents himself. The only way you get that is through some notion of Pinkerton or conspiracy, whatever. And I'm not sure that guideline allows for that in that particular context. That's a two level. That's right, Your Honor. Happy to address that. But if I can, can I just take a moment to explain why I think this is a uniquely persuasive situation for this error? And that's because this error was actually if there was an error here, which Judge Niemeyer, if you're hypothesizing, there might have been. The court sort of said it's all irrelevant because I'm going to give them such a downward variance and did. Right. So there are three reasons. It says that's a variance I would do regardless of the calculations. That's right. I understand all that. Right. So, I mean, the district court was crystal clear that this guidelines calculation was not going to affect the sentence that it imposed. So I don't think there's any concern about that. But on the merits, I think if this court were inclined to address the merits, it would it would force the court to resolve, I think, some tension between it's between, I think, the intuition that Your Honor identified, which is also, I think, tracked in this court's decision and more regarding 3B 1.3 and this court's decision in white, which is both of these cases are identified in our brief. So in white, this in the relevant conduct guideline applies to Section 2B 1.1 B9A, such that at a minimum, the defendant, him or herself need not make the representation. Right. And the court's holding, I don't think necessarily depends on the conclusion as to as on a conclusion as to whether the defendant is misrepresenting him, whether the misrepresentation concerns the defendant, him or herself or not. But the facts in that case in white, the person who made the phone call identified himself as a government agent and that was not the defendant. The defendant was the person who directed that person to make the phone call. And so that actually is quite similar to the circumstances here where somebody else is identifying himself as the government agent, not the defendant. But this court held that 2B 1.1 B9A applies in that circumstance. Now, I very much understand the court's concern about the language of the guideline, the defendant, and this court's decision and more concerning 3B 1.2 also relied on that language, the defendant in holding that 1B 1.3 didn't apply. We do this also in drugs. You know, even in conspiracy cases, we look for, we have a little bit of a different standard. We look for the evidence that's imputable, foreseeable to the defendant. So there are adjustments during sentencing and under the relevant conduct that. That's right, Your Honor. And I'd like to explain, I think 2B 1.1 B9A is a particularly good example of a guideline where the relevant conduct 1B 1.3 provision should apply. And that's because unlike 3B 1.3, which is the abuse of trust guideline that was addressed in Moore, that guideline really depends on a relationship between the defendant and the victim. It's whether the defendant abused the trust of that victim placed in the defendant. By contrast here for the misrepresentation as a government agent, the harm is exactly the same whether or not it's Mr. Dot or another defendant who's the person who's representing themselves to be a government agent. The harm is precisely the same. And so I think 2B 1.1 B9A is actually quite a good candidate for applying the relevant conduct guideline. And so that's the government's position on 2B 1.1 B9A in this case. I'm happy to address any other questions the court may have, including the over 55 enhancement. But unless if the court doesn't have any further questions, we're happy to rest. Judge King, you have anything more? I'm good, Jake. Okay. Judge Cullen? No, thank you. Okay. Thank you, Mr. King. Mr. Carpenter, give you some rebuttal now. Thank you very much. You promised to touch some of the sentencing aspects and you're free to do that. And if we really get into a difficult question, we can bring Mr. King back. But I think we'll hear you first. Thank you. Yeah, I'll touch on sentencing. We'll sort it out there if that's okay. Specifically, the enhancements for misrepresenting a government agent. I think you're right, Judge Niemeyer. The plain language is pretty clear. It has to come from the defendants. And that didn't, as I said, happen here. But why don't you address the argument that the government makes, which is essentially that's like any other element of the offense. That is a misrepresentation of the government by the conspiracy. And he's imputed with that wrong. Indeed, in this case, he knew that there was a representation of a judge, misrepresentation of a agent. I still think it's supported by the plain language here or the commentary. I think the commentary would address that if that were part of the relevant conduct part or relevant to that enhancement. And so I don't think you need to get away from the plain language here when it says the defendant has to be the one doing it when clearly he was not doing it. And there's also two other sentencing enhancements that I want to talk about. The first being the minor participant 2L reduction that was not given. The comment to that particular sentencing guideline, if I may read briefly, comment 3A says that the reduction should apply if the loss amount greatly exceeds the defendant's personal gain from a fraud scheme or fraud offense or if the defendant had limited knowledge of the scope of the scheme. We've already talked about that he didn't have limited full knowledge of everything that's going on. But the personal gain part of it is applicable here. The testimony was that he received three cents a minute for his role in this for the phone lines, which Rosenberg testified was about $700 to $800 a month, depending on how much they used their phones that month. When you take the duration of the conspiracy at 40 months, you get $32,000 that Mr. Dot got throughout the conspiracy. The total conspiracy amount was $7 million that was found. That amount is 220 times the personal gain that Mr. Dot received from this. And so that's greatly... Let me ask you this. I understand that argument. I think it's a good argument to make. The question I am troubled by is that this whole operation only works with the ability and a skill to be able to adopt and collect numbers, use different numbers to change numbers, to move locations, to reinstall phones. The whole operation is essential. That depends on it. Obviously, once you have the phone connections and perceptions of whether the FBI is tracing you and all that type of stuff, the more important part is probably the persuasiveness of the speakers in hooking the victims. But none of that could have taken place without this sophisticated technology. And so if a court were to conclude that the technology were very important to the conspiracy, how does that play with respect to what you were just saying? That this co-conspirator was providing a very important part of the conspiracy. Well, thank you. Let's talk about that. You know, the argument, the government presented their entire case on the idea that this is special technology that was used for this. Well, there's nothing special about this technology. Today, we're having this whole argument using voice services, using this technology. Yeah, but you know, how many people know how to install a phone in Costa Rica, use voice over Internet mechanisms, obtain a telephone line from Washington, D.C. or New York, 202 code or 212, and then be able to get new phone, numerous new phone numbers on a repeated basis without being discovered and knowing when the I don't know. I'm not. I would sort of admire that if I saw that. I understand you would, Your Honor. But that doesn't say anything because I'm not of the current generation that are so computer smart. And with all due respect to Judge Cogburn, who I'm friends with, no, I don't think he was familiar with it either. But there's nothing unique or uncommon about this. I think, obviously, there's nothing in the record to support me saying that. But I think you can take crucial notice of how common voice services are. Well, I know that is. But I think the idea of setting this up, taking it down, setting it up with phone lines, getting phone lines in or going over the Internet, the signal is probably much more common. And a lot of people do that. But I'm thinking also, how do you get telephone numbers assigned to you and then abandon those numbers and get new numbers assigned? And if you keep going back to the same source, a little bit like the oxycontin, at some point there gets to be a suspicion. So you have to have I don't know where you get those numbers from, whether they're a single person makes a judgment or you have to speak to somebody or can you get it just by Internet connection? I don't know. I can call Verizon now and have Verizon. You change your number today and then tomorrow and then next week and then again next week going to Verizon. Would they keep giving you new numbers? I would assume so. Are we putting a duty on Verizon to check those sort of things? No, but it might raise something question, wouldn't it? Well, it might. But does that does that equal conspiracy or aiding and abetting of fraudulent activity? That's all circumstantial evidence. I do want to answer the first question you asked. I know we're out of time, but if I could do that real briefly. You know, I would compare what Mr. Dot did. Sure, it was essential to the scheme, but so was Vanell, so was Western Union, MagicJack, a company that did this beforehand. They did the same thing. They were essential. They're not here. They were not prosecuted. And this is the first prosecution of anybody like this the government's ever done. They prosecuted many of these schemes, never prosecuted anybody who's provided these services before. Are you claiming an impermissible selective prosecution? Certainly, I do question. Are you claiming a constitutional deprivation by selective prosecution? This is not argued in the brief or this report. What's your claim then? What's that got to do with it? Okay, well, I think it's I think it's important for the court to know that to have the context of what this case is all about. They prosecuted numerous of these. This is the first time that this has been prosecuted. And they're going to they made this very clear in sentencing. They're going to keep prosecuting these people who are helping out providing phone services. And where does that kind of stuff? I mean, that's what they ought to be doing, I would think. I mean, that's what prosecutors do. They try to weed out crime and put a stop to it. There's a thing called deterrence. Yeah, there's nothing wrong with with this. But if you give them an opportunity to prosecute somebody who's just providing normal services, this is what he did for a living was provide these services to Burger King, KFC, everybody. Then the door is open to go after the Verizon, so the other companies, the other small guys who provide services that are used illegally. And that's the policy concerns underlying this whole appeal that I think the court should take into account and consider how this is going to affect future prosecutions and future case law. And I know way over time, I didn't want to address Arnold's error on sentencing, but it looks like I'm out of time. Thank you, Mr. Carpenter. I know that you were court appointed. And I want to give a special recognition for that, as you know, that's so important to our system. And you've done a fine job. And we appreciate your service very much. I'm sure your client does also. At this time, we would normally come down and shake your hands. And we can't do that today. But we do thank you for your arguments and welcome you to the Fourth Circuit. Hope you're both back many times.
judges: Paul V. Niemeyer, Robert B. King, Thomas T. Cullen